*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NANCY THURSTON and CRAIG THURSTON,

Plaintiffs-Appellants,

v

PHYSICIAN HEALTHCARE NETWORK, PC,
STACIE HILL, PA-C, and CHRISTINE LAMING,

Defendants,

and

MCLAREN PORT HURON, MARC JONES, D.O.,
COVENANT MEDICAL CENTER, INC., doing
business as COVENANT HEALTHCARE,
ANDREW BAZAKIS, M.D., and JAMES
MLENJEK,

Defendants-Appellees.

UNPUBLISHED
July 27, 2023

No. 360071
St. Clair Circuit Court
LC No. 18-000480-NH

Before: LETICA, P.J., and BORRELLO and RIORDAN, JJ.

PER CURIAM.

Plaintiffs Nancy Thurston and Craig Thurston, her husband, appeal as of right the trial court's grant of summary disposition in favor of defendants McLaren Port Huron, Dr. Marc Jones, Covenant Medical Center, and Dr. Andrew Bazakis. On appeal, plaintiffs argue that the trial court erred by ruling that they failed to establish a genuine issue of material fact as to factual causation with respect to McLaren Port Huron and Dr. Jones. Plaintiffs also argue that the trial court erred by ruling that they failed to establish a genuine issue of material fact as to whether Nancy had a physician-patient relationship with Dr. Bazakis. We affirm.

## I. FACTS

-1-

On September 5, 2015, Nancy received medical treatment from Stacie Hill, PA-C, at Physician HealthCare Network, PC, for complaints of headache, light sensitivity, and nausea. She was 61 years old at the time. According to the treatment notes, Nancy complained that the headache had woken her up the previous morning and that the pain went from her shoulders to the front of her head. She denied any injury to her head. Nancy was administered and prescribed medication, and she was told to go to the emergency department if her symptoms progressed or worsened and to follow up with her family care doctor in one or two days.

Shortly before 10:00 p.m. on September 7, 2015, Nancy presented to the emergency department at McLaren Port Huron, where she was treated by Dr. Jones. The treatment notes indicated that Nancy complained of headaches that had been "waxing and waning for the past 2-3 days," along with "mild photophobia at times," and "nausea at times." Nancy had denied any speech problems, but Craig reported that Nancy had "an episode of garbled speech just prior to arrival that lasted approximately 20 seconds." Nancy did not recall this episode. Nancy did not report any confusion, loss of consciousness, isolated areas of weakness, paresthesias, or loss of vision.

Dr. Jones was initially worried about the possibility of stroke based on the incident of garbled speech that Nancy did not recall. Dr. Jones performed a focused physical and neurological examination of Nancy, and everything was within normal limits. He noted that Nancy was alert, was oriented times three, had a normal speech pattern, and did not display any motor sensory deficit. A CT scan of Nancy's brain was taken, which revealed an "acute Intercranial hemorrhage left Inferior frontal lobe."

Dr. Jones discussed the CT scan results with plaintiffs and told them that Nancy needed to be transferred to a different hospital because her condition required neurosurgical services and interventional radiology services that were not available at McLaren Port Huron. Dr. Jones told plaintiffs that he recommended transferring Nancy to McLaren Macomb or St. John's Detroit. However, plaintiffs requested to have Nancy transferred to a facility in Saginaw instead because plaintiffs were apparently originally from the Saginaw area.

Dr. Jones spoke to Dr. Bazakis, an emergency physician at Covenant in Saginaw, and discussed Nancy's case in detail, including the CT scan results. Dr. Jones recalled telling Dr. Bazakis that "we didn't have the capabilities to further manage the patient," and he asked Dr. Bazakis if Covenant was able to accept Nancy. Dr. Jones testified at his deposition that he did not specifically confirm whether a neurosurgeon or interventional radiologist would be present or available upon Nancy's arrival at Covenant. He indicated that his inquiry was focused on whether Covenant could provide care and services for the patient that were unavailable at McLaren Port Huron, but Dr. Jones did not focus on specific treatments or procedures. According to Dr. Jones, he believed that he asked if neurosurgical services were available. Dr. Bazakis agreed to accept the transfer.

Dr. Bazakis testified in his deposition that he did not have any specific memory of Nancy or of any conversation with Dr. Jones or any other physician involved in the transfer. Nonetheless, after consulting his record from the telephone conversation with Dr. Jones, Dr. Bazakis was able to testify that Dr. Jones told him Nancy had intracranial bleeding and that there was a CT scan showing "positive intracranial hemorrhage." Dr. Bazakis further testified that Dr. Jones told him

that Nancy needed a neurosurgeon and that Dr. Jones asked if there was a neurosurgeon at Covenant. Dr. Bazakis testified that when a physician from another hospital calls seeking to transfer a patient to Covenant and requests a particular specialist, he "typically" contacts the specialist before accepting the patient because it is "customary" to do so.

Dr. Franck Schinco was a neurosurgeon on staff at Covenant. Dr. Bazakis testified that "[i]n this case, Dr. Schinco was contacted," although Dr. Bazakis did not have a memory of the specific conversation. Further, Dr. Bazakis explained that if the transferring physician only requests a neurosurgeon, then Dr. Bazakis simply moves forward based on that request; Dr. Bazakis stated that this deference was accorded because in such a situation, he would not have conducted his own examination of the patient at that point. Whether a change of subspecialty is necessary is a decision for the doctor who actually treats the patient after the transfer. Dr. Bazakis thought that Covenant had an interventional radiologist on staff in 2015. Although Dr. Schinco had assented to the transfer, Nancy was not being admitted directly to Dr. Schinco's care. Dr. Bazakis did not have any involvement with Nancy once she arrived at Covenant.

The following note is contained in the section of the McLaren Port Huron emergency department record labeled "Medical Decision Making":

> Patient reexamined and resting comfortably in bed. Patient and family updated on results. Patient and family requests transfer to Saginaw secondary to being from that area. Patient will be transferred secondary to no neurosurgeon at her hospital. Case was discussed in detail with Dr. Bazakis, who will accept transfer. Covenant Hospital.

Nancy left McLaren Port Huron by ambulance at approximately 11:49 p.m. Richard Hahn, who was an EMT paramedic, was one of the crew members on the ambulance. Hahn testified that Nancy initially was alert, was partially sitting up, and appeared stable. However, approximately seven minutes before the ambulance arrived at Covenant, Nancy complained of a sudden headache with pain of 7 out of 10. About three minutes later, Nancy experienced a change in mental status. She stopped responding to verbal stimuli and was staring to the right. Her pupils were unresponsive to light, and Hahn observed further symptoms of stroke that included facial droop and right-side weakness.

Nancy arrived in the Covenant emergency department by approximately 1:40 a.m., where she was examined by emergency room physician Dr. James Mlenjek. He observed right side facial droop with right-sided hemiparesis and some right-sided neglect. Dr. Mlenjek also indicated that Nancy was speaking with the hospital staff and was alert, although she had some garbled speech. He determined that Nancy was displaying signs of stroke. Dr. Mlenjek called Dr. Schinco to update him about Nancy's case and inform him that her symptoms had worsened. Another CT scan was ordered, which showed a large left anterior frontal lobe intraparenchymal hemorrhage and a small subarachnoid bleed along the anterior left frontal lobe. Dr. Mlenjek explained that this meant there was bleeding both within the brain and between the brain and skull. The CT scan also showed a rightward midline shift of 6 millimeters caused by the increased pressure on the brain from the bleeding.

Next, a CTA scan of Nancy's brain was ordered because of the location of the bleeding. The CTA scan suggested that there was a ruptured aneurysm of the left internal carotid artery. Dr. Mlenjek discussed the results with Dr. Schinco, and Dr. Schinco requested to transfer Nancy to the University of Michigan Health System. Nancy left Covenant at approximately 3:29 a.m. and was transported to the University of Michigan by ambulance with advanced life support.

Nancy arrived at the University of Michigan emergency department at approximately 5:20 a.m. Another CT scan was performed, which showed "a slight interval increase in the size of the left frontal intraparenchymal hemorrhage with new intraventricular extension, bifrontal subdural hematomas, and subarachnoid hemorrhage in the left frontotemporal region." Later that morning, she underwent a coil embolization of the left paraophthalmic carotid aneurysm and a right sided frontal ventriculostomy. On September 10, 2015, Nancy underwent a left sided craniotomy.

Dr. Schinco testified in his deposition that he did not perform coiling procedures and that nobody in his neurosurgical practice at Covenant performed coiling procedures for aneurysms. He treated aneurysms by "clipping." He indicated that coiling was more appropriate for certain aneurysms and that in such a case, the patient was typically transferred to a different hospital. Dr. Schinco stated that he would not accept a patient if he knew that coiling would be necessary, but he further explained that it was difficult to determine before a patient arrived whether coiling would be needed. He also indicated that Covenant treats people with bleeding on the brain and aneurysms.

According to Dr. Schinco, a CT scan would not typically show an aneurysm, while a CTA or cerebral angiography could show the existence of a ruptured aneurysm. When asked how he determined whether an aneurysm was more appropriately treated by clipping or coiling, Dr. Schinco answered: "That is a difficult question based on the findings of images as well as judgment for doing this for 20 some years." Dr. Schinco explained that he considers the shape of the aneurysm, the location, and the arteries leading to it.

With respect to Nancy's aneurysm, Dr. Schinco stated that coiling was appropriate based on the location of the aneurysm, which made treatment by surgical exposure and clipping difficult. Dr. Schinco testified that he did not see evidence of an aneurysm in the CT scan from McLaren Port Huron but that he was able to determine the existence of an aneurysm, as well as its location, from the CTA performed at Covenant. Furthermore, Dr. Schinco explained that at the time Nancy was transferred to Covenant, there were potential causes of the intracranial hemorrhage other than aneurysm that had yet to be ruled out, including tumors, infections, vasculitis, high blood pressure, amyloid angiopathy, and arterial venous malformations.

On February 28, 2018, plaintiffs initiated this action for medical malpractice. According to the complaint, Nancy had suffered permanent significant deficits in speech, cognitive functioning, and motor functioning. Plaintiffs essentially allege that the damage resulting from Nancy's aneurysm and hemorrhage would have been eliminated or diminished if not for defendants' professional negligence in failing to timely provide proper diagnosis and treatment of Nancy's condition. As relevant to the issues on appeal, plaintiffs specifically allege that Nancy should not have been transferred to Covenant without first ensuring that Covenant had the ability to provide proper and adequate treatment for her acute intracranial hemorrhage. Plaintiffs further allege that the delay in recognizing the type of treatment needed and in getting Nancy to a facility

that could provide the proper treatment allowed her condition to deteriorate and increased the resulting damage. A loss of consortium claim is alleged on behalf of Craig.

Dr. Bazakis and Covenant moved for summary disposition under MCR 2.116(C)(10), arguing that there was no genuine issue of material fact that a physician-patient relationship never existed between Dr. Bazakis and Nancy. Dr. Bazakis and Covenant contend that Dr. Bazakis did not see, treat, evaluate or speak to Nancy at any point and that Dr. Bazakis did not make any treatment or diagnosis decisions regarding Nancy, or otherwise participate in her treatment or diagnosis. Dr. Bazakis relied primarily on his deposition testimony in which he testified that he did not have any involvement with Nancy's treatment once she arrived at Covenant, that he never saw or evaluated Nancy, and that he never sought to establish a physician-patient relationship with Nancy.

Plaintiffs opposed the motion for summary disposition filed by Dr. Bazakis, arguing that there is a genuine question of material fact whether a physician-patient relationship was formed between Dr. Bazakis and Nancy. Plaintiffs maintain that Dr. Bazakis sufficiently participated in Nancy's treatment by facilitating and accepting her transfer to Covenant in light of the information provided by Dr. Jones regarding her condition and that Dr. Bazakis essentially represented that Covenant possessed the necessary capabilities to adequately treat Nancy's condition despite the fact that there was not a specialist at Covenant that could perform the coiling procedure Nancy's condition potentially required at the time of transfer and ultimately did require.

Following a hearing, the trial court granted summary disposition in favor of Dr. Bazakis and Covenant. The trial court reasoned:

> Clearly this is not a case of consent where Doctor Bazakis had consented to enter into a physician/patient relationship. If one exists at all it is an implied physician/patient relationship which is to be determined on a case by case basis which is clearly fact specific.
>
> The facts in this case are those that were known to Doctor Bazakis at the time that he received a call, a single phone call from Doctor Jones at McLaren Port Huron and the information that has been—or at least the information that was provided to him in my view from my review of the evidence in this case was extremely limited and it was for a neuro surgical- consult and whether or not Covenant had the ability to perform that particular service as part of the referral process that exists between hospitals of varying degree of capability. Covenant being a step or two beyond what McLaren Port Huron is capable of providing. So I understand how that process works.
>
> The information that I have reviewed suggests that the—it was very limited. It did not get into the specifics of what may or may not be the ultimate treatment or the ultimate conclusions that may be reached after the patient is received by Covenant.
>
> Doctor Bazakis took the reasonable and necessary step in my view of consulting with the neurosurgeon on call as to whether or not this was a patient that

should or should not be accepted. What that suggests to me is that he is distancing himself from any involvement as a, a physician involved in a physician/patient relationship. Certainly he is performing his job as an emergency medical medicine physician at Covenant in attempting to make or pass on the relevant information to Doctor Jones, but he is certainly not engaging or attempting to engage in any treatment or diagnosis or interjecting himself in any way in the care and, and treatment of Ms. Thurston at that particular moment in time and that is something that he needs to do in order to be held as having established by implication a physician/patient relationship. He didn't want to do that and he didn't do that.

The position that the Plaintiff takes in this case is one that Doctor Bazakis should have asserted himself at a greater level and he should have asked questions and he should have known various things and he should have assumed certain things were going to take place as a part of the treatment and diagnosis if the acceptance was approved. He has no obligation to do that. He has no duty to do that. This is a question of duty. That duty does not exist and he certainly heeded to his responsibilities there and did not engage in those types of activities. Had he done so we may be dealing with a different situation here.

Even though this is a (C)(10) motion and it is to be viewed in a light most favorable to the non-moving party there still has to be a genuine issue of material fact. That may mean that some facts do exist, but they don't rise to the level of a genuine issue of material fact. In my view there is none regarding the issue of physician/patient privilege. Motion is granted. Or not privilege. Relationship. Motion is granted.

Dr. Jones also moved for summary disposition pursuant to MCR 2.116(C)(10), arguing that plaintiffs could not establish causation. Dr. Jones maintained that plaintiffs had not provided any expert medical testimony that Nancy's decline in condition that occurred while in transit to Covenant more likely than not would have been avoided if she had been transferred to a different hospital in the area. Dr. Jones argued that plaintiffs' causation theory was speculative. McLaren Port Huron joined and concurred in the motion for summary disposition filed by Dr. Jones.

In response to Dr. Jones's motion, plaintiffs argued that the testimony of their causation expert, Dr. Gregg Zoarski, M.D., created genuine questions of material fact regarding causation such that summary disposition was improper.

Dr. Zoarski opined that the hemorrhage that Nancy suffered during transport from McLaren Port Huron to Covenant was a "substantial hemorrhage" that "more likely than not did affect her outcome" based on the symptoms she displayed. Dr. Zoarski discussed three separate bleeding events that Nancy experienced that night. First, the CT scan from McLaren Port Huron showed an acute subarachnoid hemorrhage and intraparenchymal hemorrhage. Nancy then experienced a re-hemorrhage while being transported to Covenant and another re-hemorrhage en route to the University of Michigan. By the time Nancy reached the University, her hemorrhage was larger and more extensive. Dr. Zoarski opined that a patient's prognosis declines as aneurysms re-bleed and that multiple hemorrhages adversely affect the long-term outcome. He further opined that her

permanent neurological injuries were worse as result of further brain injury from the re-hemorrhage that occurred between Covenant and the University of Michigan.

Dr. Zoarski summarized his causation opinion as follows:

*Q*. What is the opinion that you intend to offer to the ladies and gentlemen of the jury at the time of trial if you are called?

*A*. So, we've talked about these recurring hemorrhages. With each recurring hemorrhage, I think her chances of a good outcome were diminished. In fact, I'm still thinking about what happened in the transport to Ann Arbor. She ultimately, because of the re-hemorrhages, needed the hemicraniotomy, the decompression. She needed the ventriculostomy. And all of those things diminished her outcome. So I think—I think the length and period of time involved in the entire process of transporting her and ultimately getting her to a hospital like Ann Arbor where she was able to get the appropriate neurosurgical care exposed her to further and further hemorrhage and brain damage.

*Q*. As to what degree of brain damage came from any degree of bleed anywhere along the way, can you state to a reasonable degree of medical probability how much was caused by an initial bleed, by a second bleed?

*A*. So, the initial bleed, if we go back to the 7th, and this is before arrival at Covenant, was minimal brain injury or mild. There's probably no such thing as minimal. If it was my brain, I would say it's mild because we shouldn't minimize it. But still it was a small subarachnoid involved on the left frontal base. The hemorrhage that she had upon arrival at Port Huron, we already discussed. And that was a more—much more significant hemorrhage, dissected into the frontal lobe and that—

*Q*. Did you mean Covenant?

*A*. Covenant, I'm sorry, Covenant. Started at Port Huron.

*Q*. Before she got—before she even got to Covenant she had a larger bleed, true?

*A*. Yes.

*Q*. And—

*A*. And that certainly adversely affected her outcome. And then we discussed the change in appearance of the CAT scan before arrival at Ann Arbor. And that hemorrhage was larger, involved more components, involved an extensive amount of shift, which adversely affected outcome and ultimately resulted in the need for the hemicraniotomy. So all along the way there were multiple—there were—there was a pretty lengthy period of time before she got to an institution where she could get—ultimately get treated.

Dr. Zoarski further opined:

Sure. But when she presented at the outpatient facility on the 5th, she had an excellent chance of having no neurologic deficits. She had at that point what was probably a sentinel hemorrhage, very small hemorrhage. We don't know exactly what the CT would have looked like but more likely than not, almost certainly it would have shown some blood. But I think her chance of being treated and having no neurologic deficits was quite high. Even when she presented with the CAT scan that she came—that she obtained as soon as she got to Port Huron, I said earlier in the deposition grade one and grade two patients have an 85 percent chance of Modified Rankin two or better. But that includes a lot of patients who are neurologically normal. So she still had a very good chance of being neurologically normal at that point. As a result of the hemorrhage that occurs just prior to arrival at Saginaw, I think it would be very unlikely that she would be neurologically normal from that hemorrhage. I mean, she could still she—she could still potentially have made it to a Modified Rankin of two but her outcome was definitely adversely affected by the re-hemorrhage and was further adversely affected by the re-hemorrhage that occurred prior to her arrival at Ann Arbor.

According to Dr. Zoarski, there is generally a good neurological outcome for repair of an aneurysm of the condition Nancy had when she first presented at McLaren Port Huron if done within 24 to 72 hours. However, Dr. Zoarski opined that as a result of the delay before reaching the University of Michigan where she could finally obtain complete and appropriate treatment for her condition, Nancy suffered another re-hemorrhage between Covenant and the University that caused her further brain injury leading to permanent deficits in memory, motor function, and right upper extremity function.

Dr. Zoarski admitted that surgical intervention (i.e., the coiling procedure) was not commenced immediately upon Nancy's admission at the University of Michigan. As the University of Michigan records show, Nancy arrived at the University emergency department at approximately 5:20 a.m. It is unclear precisely when the surgical intervention began later that morning, although the parties do not dispute that the intervention occurred at least a few hours later.

Dr. Zoarski also testified that based on the bleeding that was evident from Nancy's CT scan at McLaren Port Huron, it appeared undisputed that Nancy could not be treated at McLaren Port Huron and needed to be transferred to a different facility. However, Dr. Zoarski opined that if Nancy had first been transferred to a facility where she could receive complete treatment, instead of Covenant, there would not have been the opportunity for her to suffer another hemorrhage while being transported from Covenant to the University of Michigan.

Dr. Zoarski explained that even though an aneurysm cannot generally be detected from a CT scan alone, Nancy's hemorrhage should have been treated as the result of an aneurysm until proven otherwise given the lack of trauma, her age, her gender, and the location of the hemorrhage. Dr. Zoarski further explained that the sooner Nancy had been taken to a facility capable of providing comprehensive treatment, regardless of whether her aneurysm required coiling or clipping, the better her chances would have been for a good outcome because she could have

received the appropriate critical care treatment sooner even if she had still suffered the same re-hemorrhage that she suffered shortly before arriving at Covenant. Thus, he opined that being first sent to a hospital, such as Covenant, that could not provide comprehensive aneurysm care adversely affected Nancy's outcome.

Following a hearing, the trial court granted summary disposition in favor of Dr. Jones and McLaren Port Huron. The trial court reasoned that Dr. Zoarski's causation testimony was speculative and that plaintiffs had failed to provide any evidence that Nancy would have actually received treatment that would have prevented the deterioration of her condition and re-hemorrhaging had she been transferred to a different facility.

Plaintiffs now appeal by right all grants of summary disposition.

## II. STANDARD OF REVIEW

"We review de novo a trial court's ruling on a motion for summary disposition." *Anderson v Transdev Servs, Inc*, 341 Mich App 501, 506; 991 NW2d 230 (2022). "MCR 2.116(C)(10) provides that summary disposition is appropriate when, '[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law.' " *Id*. "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019).

## III. DISCUSSION

## A. PHYSICIAN-PATIENT RELATIONSHIP

Plaintiffs argue that the trial court erred by ruling that they failed to establish a genuine issue of material fact as to whether Nancy had a physician-patient relationship with Dr. Bazakis.[1] We disagree.

"Without the existence of a legal duty, there can be no actionable negligence." *Oja v Kin*, 229 Mich App 184, 187; 581 NW2d 739 (1998). "In medical malpractice actions, the duty owed by a physician arises from the physician-patient relationship." *Id*. "A physician-patient relationship exists where a doctor renders professional services to a person who has contracted for such services." *Id*. (quotation marks and citation omitted). Generally, a physician-patient relationship does not "arise[] from a treating physician's solicitation of a colleague's informal opinion on patient treatment . . . ." *Hill v Kokosky*, 186 Mich App 300, 303; 463 NW2d 265 (1990).

The evidence in this case shows only that Dr. Bazakis received a telephone call from Dr. Jones and confirmed that Covenant offered and had available the particular medical services requested by Dr. Jones. Dr. Bazakis did not agree to diagnose or treat Nancy, nor did he provide

---

[1] While the parties frame this issue as one of material fact, we note that "[t]he existence or nonexistence of a legal duty is a question of law for the court to decide." *Oja v Kin*, 229 Mich App 184, 187; 581 NW2d 739 (1998).

any medical advice to her. Nothing in the record suggests that Dr. Bazakis assumed an implied responsibility to act on her behalf beyond confirming that Covenant was able to provide the medical services urged by Dr. Jones. Simply put, a physician-patient relationship is not established with every doctor involved in the chain of communication regarding a particular patient. Further, even if the evidence suggested that Dr. Bazakis offered his professional opinion to Dr. Jones, which it did not, "merely listening to another physician's description of a patient's problem and offering a professional opinion regarding the proper course of treatment is not enough" to establish a physician-patient relationship. *Oja*, 229 Mich App at 190.

In sum, Dr. Bazakis merely facilitated a referral. He did not offer advice to Dr. Jones regarding Nancy's neurological treatment. Nor did Dr. Bazakis actively participate in the course of her treatment or any medical decisions relating to that treatment. Under these circumstances, the trial court correctly concluded that there was no physician-patient relationship between Dr. Bazakis and Nancy, and thus he did not owe a such a duty to her.[2]

## B. FACTUAL CAUSATION

Plaintiffs argue that the trial court erred by ruling that they failed to establish a genuine issue of material fact as to factual causation with respect to McLaren Port Huron and Dr. Jones. We disagree.

"In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants." *Robins v Garg*, 276 Mich App 351, 362; 741 NW2d 49 (2007) (quotation marks and citation omitted). " 'Proximate cause' is a term of art that encompasses both cause in fact and legal cause." *Id*. (citation omitted). "Generally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or 'but for') that act or omission." *Id*. (quotation marks and citation omitted). Factual causation "requires more than a mere possibility or a plausible explanation," as well as evidence that "exclude[s] other reasonable hypotheses with a fair amount of certainty." *Craig v Oakwood Hosp*, 471 Mich 67, 87-88; 684 NW2d 296 (2004) (quotation marks and citation omitted). In other words,

> [a]s a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.

---

[2] Plaintiffs correctly observe that the substance of the discussion between Dr. Jones and Dr. Bazakis involved medical knowledge and judgment. However, the question here is not whether Dr. Bazakis used medical knowledge and judgment or performed a mere administrative role in facilitating the transfer, but whether his medical knowledge and judgment was undertaken specifically on behalf of Nancy in the course of a physician-patient relationship.

[*Skinner v Square D Co*, 445 Mich 153, 164; 516 NW2d 475 (1994) (quotation marks and citation omitted).]

We initially note that the evidence did not show that the hemorrhage suffered by Nancy shortly before her arrival at Covenant would not have occurred if she was transferred to an appropriate hospital as plaintiffs contend. In particular, Nancy was transferred from McLaren Port Huron to Covenant, which was about a 90-minute drive, and she suffered the hemorrhage a few minutes before her arrival at the latter institution. Assuming *arguendo* that plaintiffs are correct that she should not have been transferred to Covenant, the only appropriate alternative for transfer supported by the evidence is the University of Michigan, which also is about a 90-minute drive from McLaren Port Huron.[3] Thus, the evidence indicates that Nancy would have suffered this hemorrhage regardless of the initial transfer decision by Dr. Jones.

With that in mind, plaintiffs argue that the detour to Covenant before the University of Michigan delayed necessary treatment—the coiling procedure—at the latter institution. Thus, plaintiffs argue, McLaren Port Huron and Dr. Jones factually caused some of her damages by allowing additional re-hemorrhaging to occur before the coiling procedure. For two reasons, we disagree.

First, Dr. Zoarski admitted when asked about Nancy's initial transfer to Covenant that he "cannot specify a particular deficit and tell you to what degree, if any, it got worse." In other words, Dr. Zoarski apparently could not identify the extent of harm, if any, that Nancy suffered due to the fact that she was not initially transferred to the University of Michigan. This tentative language, particularly the "if any" qualifier, suggests that Dr. Zoarski was merely speculating that the delay in transfer to the University of Michigan caused additional damages to Nancy. See *Skinner*, 445 Mich at 164.

Second, and more importantly, plaintiffs failed to show that the University of Michigan would have performed the coiling procedure in a more timely manner if she was directly transferred to that institution from McLaren Port Huron. In particular, Nancy actually arrived at the University of Michigan at about 5:20 a.m., and the coiling procedure was performed at least a few hours later.[4] Under plaintiffs' theory, she should have arrived at the University of Michigan at about 1:30 a.m. after being directly transferred from McLaren Port Huron. Plaintiffs do not clearly explain how or why the coiling procedure would have been performed earlier if Nancy had arrived at the University of Michigan earlier that morning. In other words, plaintiffs do not show that if Nancy had arrived at the University of Michigan at about 1:30 a.m., the coiling procedure

---

[3] While plaintiffs argue that Nancy could have been transferred to Hurley Medical Center in Flint, we agree with the trial court that the April 2015 webpage from that institution advertising coiling by interventional radiologists, which was the only evidence that plaintiffs presented regarding that institution, was insufficient to show that Nancy would have promptly received that treatment if she had been transferred to that institution on the night in question.

[4] Dr. Jones represents on appeal that it was performed at 11:02 a.m.

-11-

would have been performed at an earlier time than it actually was performed. Indeed, Dr. Zoarski merely testified as to a possibility that the procedure would have been performed at an earlier time:

> So, had in the hypothetical where she goes directly to Ann Arbor, she's now presenting at Ann Arbor with a re-hemorrhage and although I can't speak for them, that now raises the . . . the concern for treating her expeditiously is now increased. . . . So, again, I can't speak for Ann Arbor, but it's very possible that they may have considered coiling her in the middle of the night rather than at 8:00 or 9:00 a.m. . . . So, once again, getting her to a center that could offer comprehensive treatment would have allowed for the possibility of sooner treatment of the aneurysm.

Thus, Dr. Zoarski testified as to possibilities for superior treatment, not probabilities. He did not exclude the possibility that Nancy would have received the same treatment regardless of whether she was delayed in transferring to the University of Michigan. Therefore, the trial court correctly concluded that plaintiffs failed to establish a genuine issue of material fact as to factual causation with respect to McLaren Port Huron and Dr. Jones. See *Craig*, 471 Mich at 87-88.

## IV. CONCLUSION

The trial court correctly granted summary disposition in favor of defendants Covenant, Dr. Bazakis, McLaren Port Huron, and Dr. Jones. We affirm.


/s/ Anica Letica
/s/ Michael J. Riordan